435 P.2d 39

**STATE of Arizona, Appellee,**

**v.**

**Harry SAUNDERS, Appellant.**

**No. 1761.**

Supreme Court of Arizona,
In Banc.

Nov. 29, 1967.

Darrell F. Smith, Atty. Gen., Carl Waag, Asst. Atty. Gen., for appellee.

Vernon B. Croaff, Public Defender; Grant Laney, Deputy Public Defender, for appellant.

BERNSTEIN, Chief Justice.

Defendant appeals from a conviction of second degree murder in violation of A.R.S. §§ 13-451 and 13-452, rendered in the Superior Court of Maricopa County.

On January 5, 1966, the Phoenix police received a call informing them of a possible assault or homicide at 115 South Eighth Avenue. Officers Scully and Sharp were dispatched to the scene to investigate. When they arrived at the address Officer Scully knocked on the door of the apartment and the defendant, his clothing splattered with blood, answered the door. Scully asked the defendant if there was any trouble, and whether anyone was hurt, but the defendant replied that nothing was the matter. At this point the officer requested permission to look around the apartment and was allowed by the defendant to do so. Upon entering the apartment he was greeted by a panorama of disarray: bloodstains on the floors, walls and bedding, wine bottles strewn all over the room, and the body of a woman lying in a pool of blood at one end of the apartment. Officer Scully then took the defendant by the arm and led him outside toward the patrol car.

The defendant asked Officer Scully whether the victim was dead, and the officer replied that he did not know. Then Scully asked the defendant what had happened, and whether he had beaten her. The defendant stated that he had a fight with the victim, and that her boyfriend had helped him. Defendant was then placed in the back seat of the patrol car. At no time during this sequence of events did Officer Scully advise the defendant of his constitutional rights.

In addition, the record shows that defendant was an alcoholic and was quite inebriated at the time the police were called to the scene.

On appeal the defendant contends that the admission into evidence of his inculpatory statement concerning the fight with the victim constituted prejudicial error, since he was not advised at that time of his constitutional rights. Since the trial of this case began on July 11, 1966, the resolution of this issue depends on an interpretation of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In Miranda the United States Supreme Court held in part that:

" * * * the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way*. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a

right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612. (Emphasis added.)

Applying the dictates of Miranda in State v. Intogna, 101 Ariz. 275, 419 P.2d 59 (1966), we held that a police officer who questioned an individual with his pistol drawn had certainly deprived that individual of his "freedom of action". In that case we said:

"While defendant was not actually arrested when the question was asked as to why he shot deceased, it will be noted from the testimony that Officer Wright had his gun drawn and was within three feet of defendant when he asked the question.

"In Miranda the court said that what was meant by custodial interrogation was questioning initiated by law enforcement officers after a person has been taken into custody. However, the court added: '* * * or otherwise deprived of his freedom in any significant way * * *' [Emphasis supplied] Certainly a defendant questioned by an officer with a drawn gun within three feet of him was deprived of his freedom in a significant way. Clearly, the officer had no intention of letting defendant escape and defendant himself could not have reached any other conclusion.

"The officer had stated he went into the house because he believed defendant was there. According to defendant's testimony, he told the officer: '* * * I am the man you are looking for.' Then Officer Wright, with his gun drawn, asked the question why he shot Bolen. We are unable to say from these facts that the statement made by defendant was voluntary. It will be noted that while Officer Wright stated he 'grabbed' him after the question was answered, the 'grabbing' of him could hardly be construed as depriving him of his freedom any more than standing within three feet of him with a drawn gun while questioning him." 101 Ariz. at 281, 419 P.2d at 65. (Emphasis added.)

Dealing with a similar set of facts in State v. Anderson, 102 Ariz. 295, 428 P.2d 672, 675 (1967), we said:

"* * * the defendant was interrogated in her home by a deputy sheriff. It would be a misconstruction of the facts to contend that the defendant would have been free to leave, for she was the obvious suspect in an apparent murder which the sheriff's department was investigating. For this reason we must determine that it was imperative for the law enforcement officers involved to inform the defendant of her constitutional right to remain silent pursuant to the privilege against self-incrimination."

The evidence clearly shows that Officer Scully must have suspected the defendant some time before he took him by the arm and led him outside to the police car. Certainly before the incriminating statement was made there was a stage at which the officer must have assumed that the defendant had committed a crime. Upon opening the door to the apartment the officer could readily see that the defendant's clothing was splattered with blood. Since the police had been called to investigate an assault or possible homicide there should have been at least a suspicion, at that time, that the defendant might be involved. More important, however, the defendant told the officer that nothing was wrong. Yet when Officer Scully entered the apartment he was met by a sight that was so inconsistent with order that he could not help but suspect the defendant. Found with blood all over his clothing, in the same room as the dead woman, the defendant would be the obvious suspect.

Officer Scully's action in placing his hand on the defendant's arm and leading him outside to the patrol car, under these circumstances, was such an infringement of the defendant's "freedom of action" that it required that the officer fully advise the defendant of his constitutional rights under

Miranda before any questions could be asked. Consequently, the trial court's failure to exclude the defendant's inculpatory statement was prejudicial error.

Although our holding requires a new trial, an additional issue is raised by the defendant that must be discussed. The defendant contends that the trial court committed reversible error when it refused to grant his requested instruction on manslaughter.

The court gave instructions on second degree murder and intoxication. The instruction on intoxication was in accordance with A.R.S. § 13–132, which provides:

"Effect of intoxication; consideration by jury

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive or intent with which he committed the act."

In State v. Hudson, 85 Ariz. 77, 331 P.2d 1092 (1958), we applied this statutory provision as follows:

"It is a well-settled, general rule that voluntary drunkenness at the time a crime is committed is no defense, Brimhall v. State, 31 Ariz. 522, 255 P. 165, 53 A.L.R. 231, and while mere drunkenness does not excuse an offense it may produce a state of mind in the accused which incapacitates him from forming or entertaining a malicious intent or that 'malice aforethought' which is an essential element of murder in the second degree. *Such voluntary intoxication or drunkenness is to be taken into consideration in determining the existence or nonexistence of malice aforethought, which distinguishes murder from manslaughter.*"

\* \* \* \* \* \*

"The defendant was deprived of the important right, which the law accorded him, to have the jury pass on the truthfulness of his story, and, *if they believed that he was intoxicated to any extent to say whether such intoxication prevented him from entertaining the malice necessary to constitute murder in the second degree, and if so, would reduce the offense to manslaughter.*" 85 Ariz. at 80, 81, 331 P.2d at 1095. (Emphasis added.)

The defendant in the instant case was an alcoholic. He had been drinking heavily at the time the crime was committed. Indeed, at the police station he was administered a breathalizer test which revealed 0.25 per cent alcoholic content in his blood. Although the trial court gave the jury the necessary instruction on intoxication, we hold under State v. Hudson, supra, that the failure to instruct on manslaughter constituted prejudicial error.

Reversed and remanded.

McFARLAND, Vice C. J. and STRUCK-MEYER, UDALL and LOCKWOOD, JJ., concur.